UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CAROLE FARLER,

    Plaintiff,

vs.                                                    Case No. 04-74368

HENRY FORD HEALTH SYSTEMS,            HON. AVERN COHN

    Defendant.
_____/

**MEMORANDUM AND ORDER DENYING DEFENDANT'S MOTION FOR ENTRY OF JUDGMENT AND DIRECTING JUDGMENT IN FAVOR OF PLAINTIFF**

I. Introduction

This is an insurance benefits case governed by the Employment Retirement Income Security Act of 1974, as amended, 29 U.S.C. § 1001 et seq. (ERISA). Plaintiff Carole Farler (Farler) is suing Defendant Henry Ford Health System (Henry Ford), claiming that Henry Ford wrongfully terminated her long-term disability (LTD) benefits under Henry Ford's policy. Farler received LTD benefits for 24 months as a result of knee problems and resulting complications, including mental problems. Henry Ford later completed a review of her file after 24 months and determined she no longer met the plan's definition of disability.

Before the Court is Henry Ford's motion for entry of judgment. For the reasons that follow, the motion is DENIED. A judgment shall enter in favor of Farler entitling her to LTD benefits with interest from the date on which her benefit payments ceased.

II.  Legal Standard  -  Motion for Entry of Judgment

In Wilkins v. Baptist Healthcare System, Inc., 150 F.3d 609 (6th Cir. 1998), the Court of Appeals for the Sixth Circuit held that summary judgment procedures may no longer be used in the Sixth Circuit in denial of benefits actions under ERISA.  In Wilkins, the court of appeals decided a district court should adjudicate an ERISA action as if it were conducting a standard bench trial and, therefore, determining whether there is a genuine issue of fact for trial would make little sense.  150 F.3d at 618-19 (Gilman, J., concurring in part and setting out the judgment of the court of appeals on the issue regarding the summary judgment standard).

Accordingly, the Court will decide this matter under the guidelines set forth in Wilkins[1] by rendering findings of fact and conclusions of law based solely upon the administrative record.  See Eriksen v. Metropolitan Life Ins. Co., 39 F. Supp. 2d 864 (E.D. Mich. 1999).

---

[1] The court of appeals' "Suggested Guidelines" are as follows:
1. As to the merits of the action, the district court should conduct a de novo review based solely upon the administrative record, and render findings of fact and conclusions of law accordingly.  The district court may consider the parties' arguments concerning the proper analysis of the evidentiary materials contained in the administrative record, but may not admit or consider any evidence not presented to the administrator.
2. The district court may consider evidence outside of the administrative record only if that evidence is offered in support of a procedural challenge to the administrator's decision, such as an alleged lack of due process afforded by the administrator or alleged bias on its part.  This also means that any prehearing discovery at the district court level should be limited to such procedural challenges.
3. . . . the summary judgment procedures set forth in Rule 56 are inapposite to ERISA actions and thus should not be utilized in their disposition.
150 F.3d at 619.

III.  Findings of Fact

The following facts are gleaned from the administrative record.

A.

Farler is approximately 49 years old.  She was employed by Henry Ford and had worked as a registered nurse at the time she filed her claim for LTD benefits.  By virtue of her employment, Farler was a participant in a LTD plan offered by Henry Ford.  The plan is governed by ERISA.  Henry Ford is the plan sponsor and Kemper National Services, Inc. (Kemper) is the claim's administrator.[2]

The plan defines "disability" as follows:

Definition of Disabled/Disability
Disabled/Disability means our determination that a significant change in your physical or mental condition due to:

1. Accidental injury;
2. Sickness;
3. Mental Illness;
4. Substance Abuse; or
5. Pregnancy,

began on or after your Coverage Effective Date and prevents you from performing, during the Benefit Qualifying Period and the following 24 months, the Essential Functions of your Regular Occupation or of a Reasonable Employment Option offered to you by the Employer, and as a result you are unable to earn more than 60% of your Pre-disability Monthly Income.

After that, you must be so prevented from performing the Essential Functions of any Gainful Occupation that your training, education and experience would allow you to perform.

---

[2]Henry Ford provides LTD benefits through a policy of insurance issued by Lumberman Mutual Casualty Company (Lumberman).  Kemper is a subsidiary of Lumberman.  According to Henry Ford, although Kemper was the initial claims administrator for Farler's claim, it was later administered by Broadspire Services, Inc., a company unrelated to Lumbermen.  For ease of reference, the Court will refer to the claims administrator as Kemper.

>   Economic factors such as, but not limited to, recession, job obsolescence, paycuts, and job-sharing will not be considered in determining whether you meet the requirements stated in the previous paragraph(s).
>
>   If we determine that you are able to maintain a state or federal license and to perform the duties of an occupation that license legally qualifies you to perform, you will not be considered Disabled from you Regular Occupation.
>
>   You will not be considered Disabled solely because of the loss or restriction of your license to engage in your Regular Occupation.

B.

On September 15, 2001, Farler submitted a claim for LTD benefits. Def. Administrative Record (AR) at 1.[3] Under "claim information," she stated that her injury was "damage to right knee – unable to walk or stand more than a few minutes." She also stated that she had continuous pain. Farler's last day of work was February 24, 2001.[4] She listed a Dr. Ravel as her primary physician, and she also listed a Dr. Pierre-Jacque as her orthopedic doctor.

On October 21, 2001, Farler underwent an EMG of her upper and lower extremities. The impression of the physician, Dr. Lisa Flaherty, was that the results were consistent with " a very mild median motor neuropathy at the wrist (carpal tunnel syndrome)." Pl. AR at 38-39. Dr. Flaherty's report also makes reference to a recent MRI scan of Farler's brain that

---

[3] Both parties have submitted an AR. The ARs are not identical. The Court assumes that materials submitted by both parties constitutes the sum of the whole AR, except those documents excluded as discussed in Part IV, B. For identification purposes, the Court will refer to documents from the AR submitted by Henry Ford as "Def. AR" and to documents from the AR submitted by Farler as "Pl. AR."

[4] Although Farler had been on LTD benefits since August 25, 2003, she had received short-term disability (STD) benefits from the period commencing February 25, 2003 through August 24, 2003. Her STD benefits are not at issue in this case.

was in normal limits. Id. at 39.

On November 20, 2001, Kemper notified Farler that she qualified for LTD benefits based on her disability, and that her benefits had been approved as of August 25, 2001. Def. AR at 3-4.

On August 16, 2002, Farler submitted to a CT scan of her lumbar spine. The results showed a bugling disc at L4/5 with mild thecal sac effacement, and at S1 there was advanced disc degeneration with mild exit foramina narrowing bilaterally. Pl. AR at 40.

On February 21, 2003, Kemper notified Farler that the 24 months of disability benefits would be coming to an end on August, 25, 2003, unless she qualified under "Part 2" of the plan. As set forth above, after 24 months, the definition of disability requires that she be "so prevented from performing the Essential Functions of any Gainful Occupation that [her] training, education, and experience would allow [her] to perform." Def. AR at 5. Kemper further notified Farler that it would be "conducting a thorough evaluation of [her] claim to determine [her] eligibility for benefits beyond [August 25, 2003]." Id. at 6. To accomplish its investigation, Kemper requested that Farler complete several forms to supply Kemper with supplemental information in support of her claim.

Between March 17, 2003 and April 30, 2003, Kemper sent multiple letters both to Farler and Drs. Lewis, Pierre-Jacque, and Flaherty, her treating physicians.[5] Each recipient received two letters, with the second containing the words "final request" in bold-faced,

---

[5] One of the letters was addressed to Dr. Lewis. This is the only reference to Dr. Lewis in the AR. Dr. Lewis is not referenced by name in either of the parties' papers.

capitalized type at the top of the letter.[6] Id. at 7-13.

Kemper admits that it received the requested additional information. Kemper then forwarded all of Farler's medical records and the additional information for peer review by Dr. Lawrence Blumberg, a specialist in orthopedic surgery, to determine whether the medical records supported a finding that Farler could not perform the duties of any occupation.

On June 9, 2003, Dr. Blumberg issued a report, concluding that Farler could perform at a "sedentary level and possibly up to a medium level." Id. at 15. He made reference to Dr. Flaherty's Estimated Physical Abilities form (EPA) dated on May 1, 2003. Pl. AR at 44-47. The EPA stated, inter alia: "the claimant could sit seven hours a day, stand four hours a day, walk four hours a day, lift or carry up to 50 lbs, could bend/stoop, squat, crawl, climb, reach above shoulder level, crouch, kneel, balance, push/pull and drive an automobile." Id; Def. AR at 15. Dr. Blumberg also noted that the medical records contained no tests for motion range or motor strength, and did not contain neurological examination results. Def. AR at 15.

On June 2, 2003, Dr. M. Elnaggar, a primary care physician, completed an Attending Physician's Statement (APS), rendering a primary diagnosis of ataxia (difficulty maintaining balance), seizures, and depression. Under the heading "objective findings," he wrote "difficulty standing and ambulating, dysanthea, gait instability." Dr. Elnaggar wrote that

---

[6] The AR contains three letters addressed to Dr. Flaherty, two with the final notice heading. Def. AR at 11-13. Review of the letters shows that one of final notice letters was sent by facsimile to the wrong telephone number. Compare Def. AR 11 and 13 with Def. AR 12. In addition, Dr. Lewis was only sent one letter for reasons unknown. Id. at 9.

Farler could not work and identified her level of both mental and physical impairment as Class 4. Pl. AR at 57. A Class 4 physical impairment means, according to Kemper's APS form means: "Marked limitation of functional capacity/capable of sedentary work." Id. A Class 4 mental impairment: "Marked limitation; unable to engage in stress or interperson [sic] relationships." Dr. Elnaggar further indicated that Farler's prognosis was "not known." Dr. Elgannar also completed an EPA form in which he stated that Farler could sit for 7 hours, stand for 1 hour with rest, and walk for 1 hour with rest, could lift up to 10 pounds partially and 11-24 pounds occasionally, carry up to 10 pounds occasionally, and occasionally bend, climb, and reach above shoulder level. He further stated that Farler could engage in simple grasping and pushing and pulling, but could not engage in fine manipulation without some form of adaptation. He ultimately opined that Farler could not work.

On July 2, 2003, Dr. Blumberg filed a Peer Review Addendum based on Dr. Elnaggar's APS. Based on the additional information, Dr. Blumberg concluded that Farler was capable of at least sedentary activity, and was thus functional. He stated that "reasonable restrictions and limitations based on the enclosed documentation would include no standing for more than one hour a day, no walking for more than one hour a day, no lifting over 24 lbs and no carrying over 10 lbs." Def. AR at 18.

In the Spring of 2003, Farler says that Dr. Flaherty referred her to Dr. Eric Kubrak, a psychiatrist. Dr. Kubrak diagnosed Farler as "suffering from a depressive disorder but could not rule out a significant organic contributing factor." Dr. Kubrak assessed Farler's functional abilities using a global assessment of function scale (GAF). The result of that assessment was a GAF of 50, which according to the Diagnostic and Statistical Manual of

Mental Disorders 4th Edition (DSM-IV) denotes "serious symptoms" or "serious impairment in social, occupational, or school functioning."  Pl. AR at 48-50.  Dr. Kubrak reported the results of his mental status exam in part as follows:

> Pt presented ambulating with a walker.  She shows psychomotor slowing.  There are soft neurological signs and symptoms detected in terms fo [sic] Pt's writing.  Her speech is slowed.  The does have difficulty with word finding.  Pt's affect generally fair range.  She denied being overwhelmed with depressive symptoms...Pt is oriented to person/place/time.  She does however report a subjective decline in knowledge base.  She clearly has word finding difficulties.  Pt becomes easily distracted reporting incidents of starting one task and being distracted by another and never returning to the original task.  She also misplaces objects on a regular basis.  She also has some difficulty with registration of information and recall.  Pt reports that she has "gotten lost before."  She uses many tricks to try to remember information and shows a general pattern of attempting to adapt to what appears to be a fairly significant cognitive decline form her previous level of functioning given that she "ran an CCU in the past."  Pt was observed to complete a "draw a clock."  Pt appeared to use a great deal of concentration to complete the task.  She appeared to fall back on logic in attempts to organize the face of the clock with appropriate numbers first placing a 12 then a 6 then a 3 and a 9 and then filling in the other numbers. ... Pt did display some unsteadiness with the pen once again demonstrating some impairment of coordination.

Pl. AR at 49.  He reported her prognosis as uncertain and that "Pt has what appears neurological signs and symptoms without a clear recognized diagnosis. Pt however failed to demonstrate significant psycho pathology that would reasonably be expected to be the cause or significant contributing factor to her neurological presentation."

On June 11, 2003, another peer review was conducted by Dr. Lawrence Burstein, a specialist in psychology.  He concluded that Dr. Kubrak's APS contained no examination findings to support his conclusions.  Dr. Burstein concluded: "While it is unlikely Ms. Farler would be able to perform the core elements of her occupation, as a registered nurse, the documentation did not substantiate impairments in functioning that would preclude Ms. Farler from performing any work at all."  Def. AR at 20.

On July 22, 2003, Kemper conducted an Employability Assessment Report ("EAR") to determine whether there were alternate occupations for which she was qualified by training, education, or experience. Id. at 21-26. Kemper also conducted a wage survey to determine whether any such occupations for which she was qualified and physically capable of performing would provide at least sixty percent (60%) of pre-disability income, as required by the Henry Ford plan. Id. The EAR concluded that sedentary, light-duty jobs did exist and that Farler was physically capable and qualified to fill those positions.[7] Id. The EAR also concluded that the jobs available would provide the requisite sixty percent (60%) income.[8] Id. Notably, the preparer of the EAR report conducted a phone interview

---

[7] The EAR identified four positions: (1) Director, Nurses' Registry (directs registry services for nurses, private duty according to regulations established by state or district professional nurse' association); (2) Hospital Insurance Representative (interprets hospital and medical insurance services and benefits to contracting hospital personnel); (3) Claims Clerk (prepares reports and insurance claims forms for damage or loss against insurance company); and (4) Coordinator, Volunteer Services (coordinates student and community volunteer services program in organizations engaged in public, social, and welfare activities). Def. AR at 24-25.

However, in the EAR's Conclusion Section, the report noted that the occupation classifications for positions (1), (2), and (4) require a bachelor's degree that Farler does not have: "It is important to note that the occupations [1, 2, and 4] require a Bachelor's degree as a minimum requirement. Ms. Farler has complete [sic] three years of college where she earned her diploma (RN) in nursing. Therefore, she may not be considered as a qualified candidate for the positions [1, 2, and 4]."

[8] Under the plan, Farler would have to be paid sixty percent of her pre-benefit salary. At the time Farler began receiving benefits in February 2001, she earned $50,979.97 annually. Sixty percent of her annual salary is $30,587.98. The EAR also performed a wage survey of each position listed in Footnote 5. Positions (1) and (2) were compensated at a mean annual wage of $58,715.00. Position (3) was compensated at mean annual wage of $33,971.00. Position (4) was compensated at a mean annual wage of $55,754.00.

It is important to iterate, however, that positions (1), (2), and (4) were defined as jobs for which Farler may not be qualified to fill for lack of a bachelor's degree. Regardless, position (3)'s minimum of $33,971.00 is greater than sixty percent ($30,587.98) of her annual salary.

9

with Farler. The preparer states the following as to their conversation:

> It is important to note that when interviewing Ms. Farler, her speech was very slow, she had difficulty processing interview questions, and she was unable to recall specific information related to her academic achievements and employment.

Def. AR at 22.

The preparer also noted that Farler reported requiring assistance with her daily living, grooming and hygiene functions and requires modifications to eating utensils in order to eat independently. Farler also reported being unable to engage in any type of housework.

On July 29, 2003, Kemper sent a detailed letter to Farler explaining that her 24 months of LTD benefits would terminate August 24, 2005. It further informed Farler that Kemper had "recently completed a review of [her] claim for continued Long Term Disability Benefits beyond the initial 24 months. It is [Kemper's] opinion that [she did] not meet the disability definition of the Policy. . . ." Id. at 27-31. Kemper summarized all of the reports received by Kemper from Farler's doctors and the peer review reports from Drs. Blumberg and Berstein. Id. In addition, Kemper informed Farler of the EAR's assessment regarding the positions she was qualified to fill, and the wage surveys taken for each of them. Id. at 30. Lastly, Kemper outlined Farler's right to appeal, the appellate process, and her responsibilities should she decide to pursue an appeal.[9] Id. at 31.

On September 11, 2003, physical therapist Michael Rozanski wrote a letter to Dr. Pierre-Jacques notifying him that Farler had been seen for seven therapy session. Rozanski noted that Farler reported continued "knee pain which is dependent upon the duration of her weight bearing activities. She [did] not notice a change in these symptoms

---

[9] Kemper explained that Farler would have to file a written request for review within 60 days from the date she received the letter. The written request was to include current medical documentation establishing her disability from any gainful occupation.

10

with conservative care.  Mrs. Farler also [reported] frequent leg muscle spasms due to [her] PMH of cerebellar pathology." Pl. AR at 37

On September 12, 2003, therapist Ron Wiens prepared a detailed Mental Residual Function Capacity Assessment.  The assessments made by Mr. Wiens noted significant memory impairments, disturbance of mood and loss of I.Q. (intelligence quotient).  Mr. Wiens referred Farler for extensive neuropsychological tests and commented that "[Farler] has decompensated to a point where she has been advised <u>not</u> to drive. [Farler is] unable to perform normal daily activities.  This loss has had a negative effect on her mood and affect." (emphasis in original).  Id. at 52.  He further stated that "Patient has been referred to a neuropsychologist for a full battery that will be conducted the week of 9/15/03.  It is my opinion that her decompensation of physical functioning – loss of memory, concentration and halted speech is of an organic basis.  Further, her depressive symptoms are a result of this loss."  Id. at 53.

On September 19, 2003, a Social Security Administration Administrative Law Judge (ALJ), Lubomyr M. Jachnycky, found that Farler was disabled and entitled to disability insurance benefits under the Social Security Act (SSA), commencing August 23, 2002. Id. at 60-67. The ALJ found that Farler had the following medically determinable severe impairments: "perhipheral neuropathy, depression, degenerative arthritis, obesity, and hypertension." Id. at 65.  The ALJ noted that while the state agency concluded that Farler could perform light work, he disagreed, noting that "[b]ased just on her depression, the claimant is moderately limited in concentration, social functioning, and in the ability to do the activities of daily living." Id.   The ALJ specifically found that Farler's "assertions concerning her inability to work are credible."  Id. at 66.

On September 25, 2003, Farler made a written appeal to Kemper with the assistance of her husband, Thomas J. Farler. Id. at 6. Kemper admits that Farler submitted additional medical information set forth above, including the ALJ's opinion granting her SSA benefits. It forwarded these new records and all of accumulated records to date to Dr. Henry Spira, a specialist in neurology, Dr. Elana Mendelssohn, a clinical and neuropsychology specialist, and Dr. Martin Medelsson, a specialist in orthopedic surgery, for peer reviews.

On October 27, 2003, Dr. Spira completed his review. Neurologically, Dr. Spira concluded that the data submitted failed to support a functional impairment that would prevent Farler from working in any position. Def. AR at 33. He noted that neither Farler nor her physicians submitted any objective neurological data from an examination performed on Farler. Id. at 34. Dr. Spira also noted that the results of previous physical examinations did not yield abnormal results. Id.

On October 27, 2003, Dr. Elana Mendelssohn completed a review of the record and also concluded that the data submitted failed to support functional impairment that would preclude work. Id. at 36. Dr. Mendelssohn noted a lack of any objective examination findings to support the conclusions of Farler's doctors and therapist. Id. at 36-37.

On October 29, 2003, Dr. Martin Mendelsson completed his review of the record. He also concluded that the record failed to support functional impairments that would prevent Farler from performing work in any capacity. Id at 39. He noted that x-rays of Farler's right knee showed no evidence of acute fracture or dislocation, and that tibial osteotomy was in good position. Id.

On November 6, 2003, Kemper forward Farler's file, including all five peer reviews,[10] to the Henry Ford LTD Appeal Committee (Committee), which included two more doctors, Drs. Jacob Lazarovic and Robert Dawes.

On November 11, 2003, the Committee notified Farler by letter that it denied her appeal. Id. at 43-44. The Committee explained that she had "exhausted all mandatory appeal procedures under the plan." Id. at 44. It further explained that she had the right "to bring a civil action under Section 502(a) of [ERISA]."

On November 17, 2003, Kemper informed Farler that the plan contained an offset provision that is effective upon the award of SSA benefits. Kemper explained that since Farler had received SSA benefits commencing August 23, 2002, she had been overpaid LTD benefits in the amount of $7,885.83. Kemper demanded payment by December 31, 2003, under penalty of a late charge that would increase the amount due to $8,214.40.

On October 1, 2004, Farler filed the instant action.

IV. Conclusions of Law

A. Standard of Review

While Farler argues that the appropriate standard of review is de novo, she goes on to argue that Henry Ford's decision was arbitrary and capricious and presents no substantive argument or analysis of the plan's provisions regarding the appropriate standard of review. Henry Ford says the plan provisions compel an arbtirary and capricious standard of review. The Court agrees. The plan expressly provides:

---

[10] Henry Ford's papers indicate that there were five peer reviews, and indeed, Def. AR only contains the five peer review doctors' reports discussed in Part II, A, 2. The appeal summary, however, contains an additional peer review doctor not mentioned previously, Dr. James Wallquist. Def. AR at 42.

13

> <u>Allocation of Authority</u>
> We reserve full discretion to manage the Group Policy, administer claims, and interpret all policy terms and conditions.  This includes, but is not limited to, the right to:
> 1. Resolve all matters when a review has been requested;
> 2. Establish and enforce rules and procedures for the administration of the Group Policy and any claim under it;
> 3. Determine your eligibility for coverage;
> 4. Determine whether proof of your loss is satisfactory for receipt of benefit payments according to the terms and conditions of the plan.
>
> This does not affect your right to request a review of a claim decision in accordance with the terms of the Plan.

This language confers an arbitrary and capricious standard as it "reserve[s] full discretion" to handle all aspects of the LTD plan, including determining whether proof of loss "is satisfactory."  See <u>Yeager v. Reliance Standard Life Insurance Co.</u>, 88 F.3d 376 (6th Cir.1996), and <u>Perez v. Aetna Life Insurance Co.</u>, 150 F.3d 550 (6th Cir.1998) (en banc) (plan language giving the insurance companies subjective judgment to determine whether a claim was "satisfactory" held to invoke the arbtirary and capricious standard of review.)  Moreover, because Henry Ford delegated its discretionary authority to Kemper to determine benefit eligibility, the standard of review applies to Kemper's decision.  <u>Lee v. MBNA Long-Term Disability Plan</u>, 2005 WL 705771 (6th Cir. Mar. 29, 2005) (unpublished).

The arbitrary and capricious standard is the "least demanding form of judicial review."  <u>Admin. Comm. of the Sea Ray Employees Stock Ownership and Profit Sharing Plan v. Robinson</u>, 164 F.3d 981, 989 (6th Cir. 1999).  A decision regarding eligibility for benefits is not arbitrary and capricious if the decision is "rational in light of the plan's provisions."  <u>Daniel v. Eaton Corp.</u>, 839 F.2d 263, 267 (6th Cir. 1988).  See also <u>Yeager</u>, <u>supra</u> at 381 (6th Cir. 1996).  Stated differently, "[w]hen it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary

or capricious." Davis v. Kentucky Finance Cos. Retirement Plan, 887 F.2d 689, 693 (6th Cir. 1989) (internal quotations and citation omitted). See also Perez v. Aetna Life Insurance Company, (en banc) 150 F.3d 550, 555 (6th Cir. 1998).

However, the Sixth Circuit has made clear that the arbitrary and capricious standard is not toothless:

> [M]erely because our review must be deferential does not mean our review must also be inconsequential. While a benefits plan may vest discretion in the plan administrator, the federal courts do not sit in review of the administrator's decisions only for the purpose of rubber stamping those decisions. As we observed recently, "[t]he arbitrary-and-capricious ... standard does not require us merely to rubber stamp the administrator's decision." Jones v. Metropolitan Life Ins. Co., 385 F.3d 654, 661 (6th Cir.2004) (citing McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 172 (6th Cir.2003)). Indeed, "[d]eferential review is not no review, and deference need not be abject." McDonald, 347 F.3d at 172. Our task at all events is to "review the quantity and quality of the medical evidence and the opinions on both sides of the issues." Id.

Moon v. Unum Provident Corp., 405 F.3d 373, 379 (6th Cir. 2005).

### B.  Conclusion

Farler first argues that Kemper's decision was arbitrary and capricious because Kemper did not have her submit to an independent medical examination, but rather instead relied on peer review reports from physicians who never physically examined Farler. As Henry Ford points out, "a plan administrator's failure to obtain an independent medical examination does not itself render [a] decision arbitrary and capricious." Donaiello v. Hartford Life and Acc. Ins. Co., 344 F. Supp. 2d 575, 582 (E.D. Mich. 2004). However, a failure to conduct a physical examination of a claimant is a factor to consider in determining whether Kemper acted arbitrarily or capriciously. See Calvert v. Firstar Finance, Inc., __ F.3d __, 2005 WL 1281755 (6th Cir. 2005).

Here, all of Farler's treating physicians essentially opined that she could not work.

All of them observed marked limitations in her functioning, particularly her mental abilities. There is no indication of any belief that Farler is malingering. Indeed, even the preparer of the EAR report for Kemper noted Farler's cognitive difficulties during the phone interview. The ALJ who awarded her SSA benefits found her entirely credible at a hearing. A review of the file shows that under these circumstances, a simple "paper review" of her claim by peer reviews was improper.

Farler also says that Kemper's decision was arbitrary and capricious because her treating physicians, not the peer review physicians,[11] were best able to determine Farler's disability and the peer review reports did not adequately rebut her treating physician's opinions. "Generally, when a plan administrator chooses to rely upon the medical opinion of one doctor over that of another in determining whether a claimant is entitled to ERISA benefits, the plan administrator's decision cannot be said to have been arbitrary and capricious because it would be possible to offer a reasoned explanation, based upon the evidence, for the plan administrator's decision." McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169 (6th Cir. 2003) (citing Black & Decker Disability Plan v. Nord, 123 S. Ct. 1965 (2003)). Under Nord, Kemper was not required to give Farler's treating physician's opinions any special weight. While Kemper had the opinions from physician peer reviews which all found that Farler was capable of some type of employment, it does not follow that Kemper can arbitrarily reject the opinions of her treating physicians. From

---

[11]To the extent that Farler argues that the peer reviews were completed by "in house" physicians and therefore unworthy of belief or somehow indicative of a conflict of interest, such an argument is misplaced. As explained in Henry Ford's papers, none of the peer review physicians were employed by the claims administrator but rather were all independent contractors.

the Court's review, it is constrained to conclude that Kemper did arbitrarily reject such opinions. This is particularly so because a full and fair understanding of Farler's condition, in the Court's view, required a physical examination of Farler. A paper review was not sufficient.

Farler also notes that she has received SSA benefits as a result of a finding a disability. In Whitaker v. Hartford Life and Accident Ins. Co., 404 F.3d 907 (2005), the Sixth Circuit made clear that "an ERISA plan administrator is not bound by an SSA disability determination when reviewing a claim for benefits under an ERISA plan. ... entitlement to Social Security benefits is measured by a uniform set of federal criteria. ... a claim for benefits under an ERISA plan often turns on the interpretation of plan terms that differ from SSA criteria." Id. at 2. Thus, although Farler's favorable SSA decision is part of the administrative record, Kemper is not bound by it. The SSA's favorable decision, however, is not wholly irrelevant. As the Sixth Circuit has stated:

> This is not to say, however ... that the SSA determination is meaningless and should be entirely disregarded. While it is true that the SSA must apply the "treating physicians rule" in its determinations, that rule provides that deference is to be given to the opinions of treating physician (over those of non-treating or reviewing physicians) where, *and only where*, there is objective support for those opinions in the record. Hence, the SSA determination, though certainly not binding, is far from meaningless.

Calvert, 2005 WL 1281755 (emphasis in original).

Here, Farler's favorable SSA determination provides support for the conclusion that the SSA found objective support for the opinion of Farler's treating physicians. Thus, while not binding, Kemper's complete disregard of the SSA's decision is another factor which leads to the conclusion that Kemper acted arbitrarily in denying Farler's claim for LTD benefits.

17

It is noted that in the SSA decision, the ALJ referred to a an APS submitted by Dr. Flaherty in which she apparently opined that Farler could lift no more than 10 pounds, an opinion quite different from her May 2003 opinion that Farler could lift 50 pounds upon which Kemper relies.  The APS apparently relied upon by the ALJ is attached as an exhibit to Farler's brief and is dated August 4, 2003.  The August 4, 2003 APS, however, was not submitted as part of Farler's LTD claim and therefore cannot be considered.  Regardless, Dr. Flaherty's May 2003 APS with respect to Farler's lifting abilities appears wholly out-of-line with the opinion of Dr. Elnaggar and is inconsistent with Dr. Flaherty's later observations of Farler's physical limitations.  Indeed, it is highly unlikely that a woman who has well-documented problems in ambulating could lift 50 pounds.

Farler also takes issue with Kemper's EAR which identified jobs which Farler was capable of performing.  Kemper concedes that the EAR identified only one position - a claims clerk - for which Farler was qualified based on her education, as the other three positions required additional education Farler does not have.  At oral argument, Henry Ford relied heavily on the conclusions in the EAR as establishing that Farler is capable of doing at least one job and therefore does not meet the definition of disability.  As Farler points out, however, the claims clerk position requires "moderate-term on-the-job training." Moreover, the preparer of the EAR noted Farler's difficulties in communications and impaired cognitive skills.  It is unlikely that Farler could satisfactorily perform the position of a claims clerk which, according to the EAR, requires the preparation of claims forms. A review of a LTD questionnaire Farler completed on March 19, 2003 that Farler has difficulty writing.  As Farler points out, her writing is like that of a "preschooler."  See Pl. AR at 84-89.  Thus, the EAR does not provide a sufficient basis for denying Farler's LTD claim.

Overall, a careful review of the administrative record shows that Kemper's decision to terminate Farler's LTD benefits was arbitrary and capricious and not the product of a reasoned decision making process. As a result, Farler is entitled to a judgment in her favor awarding her LTD benefits.

SO ORDERED.


Dated:  July 5, 2005
                               s/Avern Cohn
                               AVERN COHN
                               UNITED STATES DISTRICT JUDGE


I hereby certify that a copy of the foregoing document was sent to counsel of record on this date, July 5, 2005, by electronic and/or ordinary mail.

                               s/Julie Owens
                               Case Manager, (313) 234-5160